The case to be heard this morning is Plumbers & Steamfitters v. Danske Bank. There are two cases on submission, Sing v. Garland and Tazalith v. Saul, and we'll take both of those cases on submission. I believe we're ready to proceed on the argued case. The sound is defective on your end, Chief. Thank you. There's a gurgling overlay to it. Is this better? Yes, it is. All right. Let me know if anything goes wrong again. Thank you, Judge Jacobs. I think we're ready to begin. Great. Thank you. Good morning, Your Honors, and may it please the Court. Carol Villegas from Labaton-Sucharo on behalf of Lead Plaintiff Appellants, and with me is William Geddes, my co-counsel from Robbins Geller. Before you on appeal, we have a securities fraud class action against Danske Bank and certain of its officers in connection with one of the largest money laundering schemes ever, $230 billion worth, run through the bank's Estonian branch for over eight years.  Finding we had not sufficiently pled falsity or scienter. In the interest of time, I'd like to focus on two categories of misstatements, and I'll begin with the compliance statements. On February 3rd, 2014, and then again on February 2nd, 2015, about a year later, defendants made statements involving the bank's compliance with anti-money laundering rules. And what they specifically said is, we take the steps necessary to comply with your customer rules. The District Court found the statement to be puffery, but we obviously disagree. And this is because the case law says you have to look at the statement itself in context and the conduct actually alleged. When you have very generic statements like the statements in the Cigna case that the District Court cited to, these are typically found to be not actionable. But even in Cigna, citing to this court's decision in JNCO Solar, recognize that compliance statements could be actionable where the compliance method is specifically described. The Moody case cited in our reply brief at 17, and a group of Televisa case cited at page 45 of our opening brief, stands for the same proposition. When you talk about taking verifiable actions in terms of compliance, that's actionable when you also allege the company wasn't taking those steps. This isn't actually verified. I mean, this isn't actually specific steps. The full statement, I think, is something like, we condemn money laundering and we take the steps necessary to comply with anti-money laundering requirements. Why isn't that just a general generic statement that we believe in these laws and comply with them? So I think the difference is that they actually call out the know your customer rule. And that is a very specific rule. It requires two things. That Danska Bank verify the identity of the person or entity opening the account, and that they identify the source of the funds. And the know your customer rule or the KYC rule is one of the strongest tools a bank has to combat money laundering by criminals and terrorists. And these KYC procedures go to the heart of the case. Our argument is that Danska Bank specifically called out this specific compliance mechanism. They didn't say, we hope to take steps or we aspire to take steps to comply. It's an affirmative statement. We take steps necessary to comply with the know your customer rule. It wasn't specific to the particular branch in Estonia, was it? It wasn't particular to that specific branch. But we would argue that this statement was misleading because at the time the statements were made, they weren't taking the steps necessary to comply with the rule and that it was such a rampant and widespread violation of the AML rule that they would have had a duty to tell the market that they weren't actually complying with the rules in that specific branch, especially because of the scope of the money laundering that we're talking about and how long the money laundering was going on. In the same case, when we talked about this, there were very specific statements about complying with Medicare advantage and prescription drug programs and so on. Nevertheless, we said that statements that say that you comply with those regulations were still covering your general statements. Is there a distinction between your case and that one? I believe in the Cigna case, they talk more about the policies that they had in place. And I think the difference here is that they specifically said that they took the necessary steps to comply with the know your customer rule. So it wasn't just we take steps necessary to comply with Medicare. It was a very specific rule that is one of the rules of the know your customer rule that is part of the arsenal of anti-money laundering. Can I ask you about an antecedent question? So your clients bought the securities in 2018, right? And all of these statements were made sometime between 2014 and 2016, with the exception of the contingencies footnote, which is after your clients bought the security. So how could your clients possibly have relied on these statements or regarded them as material when they bought the ADRs? So what we'd say there, Your Honor, is that it's perfectly ordinary for a plaintiff in a PSL or a case to purchase shares in the middle of a class period and not to have purchased before each false statement. All we have to show is a sustained course of conduct, which is what we allege here. And we allege that there at least be some statement on which your clients relies that they could state. Your clients have to state a claim, right? Yes, and we would say that we relied on these statements about compliance, the whistleblower statement. We allege that the truth about these statements didn't fully come out until the end of the class period. That essentially the scope of the scheme and the impact that it would have wasn't revealed until it started to come out in dribs and drabs over... So you're saying even in March 2018 or whenever it was exactly that your clients bought the securities, you would not have been aware that there was this money laundering investigation? So it wasn't just the money laundering investigation. And I think this is more of a truth on the market argument. The money laundering investigation may have come out at that time, but the scope of the money laundering investigation and the effect that it was gonna have on the bank and on the bank securities, that didn't fully come out until the end of the class period when the market learned that the scope of it was incredibly widespread and that it was gonna have very detrimental effects on the bank. But there were repeated disclosures by the bank. I mean, in 2016, they disclosed the result of the AML investigation by the Danish authorities. They commissioned the B&H report. So is your theory that despite these... And that was released in 2018. Your theory is despite these disclosures, these statements you rely on were somehow propping up the price of the stock and misleading your clients? Absolutely, Your Honor. Because again, the scope didn't become known until the very end, the $230 billion. And we would argue that what we're really talking about here is materiality. And materiality is highly fact-intensive. It's not usually appropriate for determination on motion to dismiss. And you have to look at both the quantitative and the qualitative factors. So even if our clients may have started to learn that there was this rampant anti-money laundering happening, well, maybe it wasn't gonna have a huge effect on the bank. But when the scope started to leak out over the course of time, it didn't all come out at once. First, there was an announcement that the Danish regulators were cracking down on the bank. Then they started to learn that the scheme was more widespread. Then they learned or thought it was 8 billion, then 30 billion, then 200, then 230. So over the course of time, they learned more and more facts that showed just how widespread the scheme was and how it was gonna affect the bank also. A lot of it, but the statements on which you rely are not, don't go to the scope of the scheme. They go to the existence of the problem, right? Like you say that they say we comply with any money laundering laws, but that sort of denies that there is this problem. You say that they, and so on, which suggests that there wasn't the problem. So, I mean, aren't the misstatements that you say that you relied on and that were misleading to you, they're about the existence of the problem. But I think you just said that your clients would have known that there was this investigation and that there was some money laundering issue or compliance with the anti-money laundering laws at the Estonia branch by the time you purchased the security. So could you really have relied on these statements? Like if you knew that there was something more than, you know, nothing? So to answer your question, and I think that this gets a little more complicated because it's really a question of loss causation and damages. How much of the artificial inflation was still left in the stock price after the market started to learn about these anti-money laundering issues? And we would argue that at the motion to dismiss stage, all we have to show is a common course of conduct or scheme, which we believe that we've alleged and that these issues are more appropriately dealt with at the class certification stage or at the expert stage. You're arguing that this is a sustained scheme and that therefore it doesn't matter that a class representative is a late arrival in the course of it. Is there a second circuit case that stands for that proposition? I know that there are some district cases that do. There are some district cases, Your Honor. I'm not aware of a second circuit case. The case that we cite to Robbins talks about interrelated misstatements and omissions and a common course of conduct or scheme to defraud. And so we would rest on that. And just in terms of the standing question, we do believe that that's more appropriate left to the experts at class certification, especially given the interrelation of, as I said, the artificial inflation, loss causation, and the damages question. That may be, but I don't see a second. Circuit case that really says that. Yes, Your Honor. But I think you acknowledged a moment ago that your clients would need to state a claim, even if it's not, they didn't suffer the same damages as everybody in the class. You're not denying that if your clients were not misled or did not suffer an injury due to the defendant's conduct,  Yes, Your Honor. Although of course we believe we've alleged that our clients have sustained an injury because the stock price declined. No, I understand. You're not saying that it's immaterial as to whether you can state a claim as long as other members of the class can. You still accept that you need to state, your clients need to state a claim too. Right, exactly. And so, and getting back to the facts of our case, which we think do state a claim, right before this first compliance statement was made in February of 2014, defendants had a lot of information in front of them. A correspondent bank had just canceled its relationship with Danske Bank because of anti-money laundering concerns. There was a credible whistleblower report which confirmed everything they had been told for years, starting in 2007 by the Danish and Estonian regulators. The bank investigated this whistleblower report. And on January 13th, which is three weeks before that first compliance statement was made, found that the customer documentation when opening the accounts was insufficient. So this was a KYC violation that was elevated to the executive board. Then they made the first compliance statement. And then the following year, they make the statement again, but we have a lot more that transpires in 2014. The executive board receives an internal audit report in February confirming the AML or anti-money laundering violations. And it says we cannot identify actual sources of funds or beneficial owners. Is this the Wilkinson whistleblower investigation? Yes, that's right, Your Honor. That was never completed and it was never given. Does anyone know what happened to it? What we know, Your Honor, is what was alleged in this B&H report, which was commissioned by the defendants. And what they said is that the executive board actually shut down the investigation. That's at paragraph 97 of our complaint. The group legal wanted to further investigate these allegations and the executive board shut it down. Even worse though, in June of 2016, so this is about six months before they make the second compliance statement, one of the members of the executive board recommended shutting down the non-resident portfolio or the NRP accounts that are the source of the money laundering. But defendant Borgen said no, because he was trying to sell the Estonian branch and speeding up an exit from these accounts could affect the sale price. So the money laundering actually continues for another year. The NRP portfolio isn't shut down until the end of 2015, early 2016. So the second compliance statement is made and the money laundering actually continues and it continues to generate 95% of the branch's profits for that year. So in light of this, we allege they weren't taking steps to comply. Some accounts are shut down and they only take new clients who have some closer ties to Estonia or something like that. I mean, there were measures, right? It wasn't a complete shutdown of the unit. But- Yes, your honor. They were taking some measures, but you have to look at that in the context of what was happening at the time because the walls were closing in on them. You had a whistleblower report with the whistleblower said, I'm gonna go to the authorities if you don't. You had the Danish regulators coming back in. You had the Estonian regulators at the end of that year. So in September come in and the Estonian regulators did another audit and they found again, rampant money laundering violations. And so at this point, defendants didn't really have a choice. So they had to start winding down the NRP, but they did it very slowly. And despite the fact that there were many of the executive board who were saying, we need to get out of this now. And so I'd like to address the Goodwill statement in that context quickly. The district court dismissed finding that we alleged only a conclusory connection between the plan to close down the NRPs and the write-down, but we disagree again because of what was happening during that time. So the bank represented to the Estonian authorities that strategically, they were gonna start winding down the relationships by the second quarter of 2015 and that they had already implemented this strategy in part. So by October of 2014, two months before the write-down, they started implementing this plan and it led to a 30% drop in top-line revenue in Estonia. We also alleged that these accounts provided 99% of the branches profits, which would no longer be possible after the strategy to shut down the non-resident portfolios went into effect. And a Goodwill impairment arises when there's a deterioration in the capabilities of the acquired assets or of the assets to generate cashflow. So in light of these allegations, the Goodwill write-down made sense because they were effectively shutting down their profit center and 99% of that branch's profits completely. And the last point I wanna make on the Goodwill write-down, which really- Okay, you're telling me why, what was going on at the same time, but what about the statement is misleading? Right, they told the market that the reason for the write-down was purely technical in nature and because of changed macroeconomic conditions. And not related to expected short-term performance. Right, and also not related to the fact that they had to shut down these NRP portfolios generating 99% of the revenue because of the rampant anti-money laundering that was happening through the branch. But they also shut down other branches. Sure, and I know the district court credited defendants explanation that similar write-downs were occurring, but we allege or we believe that it's just as plausible that defendants took a write-down of all of these units together to hide the fact of the widespread money laundering, which was known to them and which was obviously negatively affecting their strategy. Yeah, but that would mean that they deliberately shut down sources of business in Finland and Northern Ireland in order to cover up for a time something that could not actually ever be covered up. And that is the money laundering in Estonia. Well, we're asking the court to draw all reasonable inferences in our favor as we believe it's required to do at the pleading stage. And there may have been things going on at the other branches, but we've alleged what was going on at the Estonian. I think you just said it's just as plausible that they were doing it because of the Estonian branch. But if it's equally plausible one way or the other, does that satisfy your pleading burden? Yes, Your Honor. I believe Taleb said the tie goes to the plaintiff and that's what we would ask the court to do here. Thank you. You've reserved two minutes of rebuttal time. We'll hear from the appellee. Good morning, Your Honors. May it please the court. My name is Brian Frawley and I appear here this morning on behalf of all of the defendants, appellees. The district court's decision should be affirmed for a host of reasons set forth in our brief. I'm gonna focus here this morning on the issues that the court alluded to earlier this morning. Starting with the temporal disconnect between the plaintiffs pleading. There is no way for the plaintiffs to plead a misstatement and fraudulent intent either with respect to the pre-2016 statements in their complaint or with respect to the July, 2018 statement. Unlike what my colleague said this morning, for example, the focus of the argument about the compliance statements, what was supposedly omitted about the compliance statement in February of 2014 or 2015 was simply that there was a compliance failure in Estonia. By any measure, that omission was no longer omitted by the time they purchased securities for the first time in March of 2018. This is not a materiality question. It's the absence of an omission. You don't have to make any judgments. You just have to look at the plaintiffs pleading. What was omitted was disclosed before they purchased. My colleague didn't address her July, 2018 statement. Well, I'm sorry, counsel. What about the point that the opposing counsel just made about the scope of the failure was not known? And so the statements still were misleading because they didn't disclose the scope of the money laundering operation. Judge Benashia, that's correct, is what the argument was just made, but that's not the allegation of what was misstated. And of course, the scope wasn't known in 2014, so it couldn't have been disclosed in 2014. So what we're tasked with here is looking at the statements that were alleged to be misleading and to determine whether or not they were misstated. I thought your argument just a second ago was that all of the information had come out about the money laundering investigation, and so therefore it wasn't really an omission. But if information had not come out about the extent of the money laundering operation and failure, then even the earlier statements still being in the marketplace would be misleading, would have affected the stock price, and maybe the plaintiff purchasers might have relied on it reasonably. I guess, but the misstatement could only be misstated if it omitted information that was known at the time of the statement. And so what was not known or what was omitted in 2014 or 2015 by any measure was disclosed before March of 2018. The problem with plaintiff's July 2018 statements are more fundamental. This court ruled in Denny against Barber that a securities fraud plaintiff can't challenge statements after they purchase stock. The plaintiff's last purchase of stock was in June of 2018. They can't challenge statements in July of 2018. That's not affected by whether or not the plaintiff's alleged a scheme to defraud. If your court reads the Denny against Barber case, that case also alleged a scheme to defraud. It's also not a question of class action standing, whether or to what extent a plaintiff that has a valid claim can assert in class action other claims is a different question. As Judge Minashi alluded to this morning, the question here is whether this plaintiff has pled a valid claim and we submit that it has not. In terms of the misstatements plaintiff alluded to this morning, the statements in Donson and Banks corporate governance disclosures was puffery by any standard. Unlike the JNCO Solar case that my colleague alludes to, the statement here was on a website disclosure, not in a securities filing. JNCO Solar contended to address statements that were in a registration statement offering stock to shareholders. What was said here is indistinguishable from what this court deemed puffery and liberty tax. Statement that we have policies, statements that they're successful or statements that we've taken appropriate steps to implement our policies were exactly what this court addressed in liberty tax and exactly why this is puffery. Does it make a difference that you said you took the necessary steps to comply? Doesn't that suggest that you are in fact complying, not just that you're taking appropriate steps or you're making an effort to comply? But Judge Minashi, I would actually say that somebody who says they're taking steps is actually implying that those steps are imperfect. They're not saying that we've wiped out money laundering. They're not saying we don't have any money laundering. And what the statement in liberty tax actually said is that we're taking the appropriate steps. I don't know if there's a difference between appropriate and necessary, but to me, this is puffery by any standard. Back in 2014, counsel, your client implemented the NRP, which certainly affected the Estonian branch radically and related cutbacks and adjustments in Finland and in Northern Ireland. As your adversary points out, an identified officer of the company said these statements were purely technical and not related to expected short-term performance. Putting aside that this was said in 2014 or 2015 and the class representative brought in later, how can that statement be true? Judge Jacobs, I think that any of us would concede perhaps the most technical thing one could do in a financial statement is to test goodwill. It is a technical accounting exercise. It's a math exercise where you test the recoverability of future cash flows compared to the carrying value of the investment. So clearly the word technical accounting exercise is true by any measure. And what Danske Bank said is not that developments in our business didn't have any effect on the accounting exercise. It said the accounting exercise didn't have any effect on our business. Plaintiffs invert that statement as Judge Caproni ruled in order to manufacture a misstatement. But what Danske Bank- I'm sorry, didn't you say that the goodwill impairment did not reflect the expected short-term developments at the bank? It said that the- Judge Menasci, Danske Bank said that the accounting exercise, the recognition of the impairment, did not affect the short-term expectations for the bank. You said reflect, isn't the word reflect in the actual statement? Why don't we focus on the actual statement? Do you have the text of it? I think it says not related to expected short-term performance of the affected business areas. So not related, doesn't that suggest that the cause of it is not the short-term performance or short-term development? Your Honor, I don't think it does because it's putting the participle into the subject matter. What the bank said is that the accounting exercise doesn't impact our future expectations. And then two months later, there's this statement from the bank that says that the impairment resulted from changes in economic conditions in Estonia and the planned repositioning of the personal banking business in 2015. Aren't you then saying that actually there were short-term developments that accounted for the goodwill impairment? Well, Your Honor, I actually found this to be one of the plaintiff's most peculiar arguments because what they are arguing is that what they say was omitted was disclosed two months later. So the plaintiff's argument is the truth was revealed in February of 2015, three years before they bought a new stock. So I don't really understand that argument. But if you actually- Okay, I understand that. But putting that aside for a second, just taking the initial goodwill impairment statement on its face, is there a contradiction between that statement and what you said two months later? If you actually look at the disclosures, it's A673 in the appendix. What Danske Bank actually said is it had adopted a worldwide policy to become a Nordic-centric bank and that it was curtailing operations throughout the world. It's not surprising that every non-Denmark business unit's goodwill was written down at the end of 2014. So that's what you did by the planned repositioning was that you were focusing on Nordic-based banks. It was not about a change specifically to the operations at the Estonian branch. Correct, Your Honor. And if you look at 678- So then it's your position that the goodwill impairment actually had nothing to do with what was going on at the Estonian branch. It is our position that if goodwill was impaired with or without what was going on at the Estonian branch. If you look at the disclosures at 678 in the appendix, Danske Bank reveals that it had reallocated capital to its business units outside of Denmark as part of its repositioning to a Nordic-centric bank. And that reduced the value of all those units, which is why all of those units had their goodwills impaired or reduced or eliminated. What my colleague didn't address this morning, which I will do very briefly if your court will indulge me is address their scienter. They didn't do it because they can't. There is no scienter theory offered in respect of the July, 2018 statements, which the misstatement there is not that you didn't disclose what happened in 2013 and 2014, but you didn't disclose the current state of laundered funds. But as Judge Caproni ruled, they don't actually plead that Danske Bank then knew what the current state of laundered funds were. And instead, if you look at the actual disclosure, the actual disclosure that's at issue here, Danske Bank said that it didn't know the extent of the laundered funds. The exact July, 2018 statement says the following. This is appendix at 699. It's still too early to draw any conclusions regarding the extent of the issues as the comprehensive investigation into the matter are still ongoing. At present, we are unable to determine the extent of the suspicious transactions and consequently the income they generated. The scienter theory in respect of the 2014 and 15 statements fair no better. The assertion that the bank had red flags about money laundering or had some knowledge about AML issues in Estonia do not render any of those statements knowingly misleading, especially when the complaint admits that throughout this period of 2014 and 2015, Danske Bank was remediating those. Whether those remediation efforts turned out to be wrong or inadequate in hindsight destroys the scienter theory in this case. And if the court ever gets to the tell lab balancing, that's the final nail in any coffin here. There is no assertion that Danske Bank had any financial interest in doing this. There's assertions throughout the complaint that we heard of again this morning that the Estonian branch accounted for 10% of the bank's profits. That was years before the class period. The Estonian branch accounted for 1.7% of the bank's profits in 2014, 0.8% in 2015 and zero, zero after that. So at the time that these plaintiffs bought stock or ADRs, the Estonian branch was nothing but a liability. If the court has no other questions, we rest on our briefs. Thank you. We'll hear rebuttal. Thank you, your honor. So I'll start with the scienter question because I do believe I have provided the court in this argument, in our complaint and in our briefs, a litany of examples and information as to how defendants received reports, received updates from the various regulators that were involved investigating them and received information from their own internal auditors and legal department that rampant money laundering was going on. I'll take it a step further because we talked a little bit about this meeting in the middle of 2014, where the whistleblower allegations were well-founded, group legal said, yes, we are violating KYC here. And instead of shutting down the accounts, as was suggested by one of the executive board members, defendant Borgen said no, because he was trying to sell the Estonian branch and he thought that a quick exit from these NRP accounts was going to negatively affect the value of the Estonian branch. So that was motive. One of the things that we take issue with on the district court is that she held us to a knowing, a knowledge standard, which is what defendants are trying to do here today. We complete scienter either through knowledge or through reckless disregard. And you, could you address scienter with respect to the transactions that bear upon the period after your client became or acquired ADRs or became a shareholder? Sure. So in our complaint, actually in our brief, I believe it's page 54, we do lay out a list of those reports. I'll specifically talk about that timeframe. So the Danish regulators come out in 2017 and say, we're cracking down. Then the defendants undertake this re-review of the portfolio that they had known for years was generating problems. When they make the contingency footnote statement, which is, we don't believe this is going to have a material effect. That's eight months into their review and two months before the B&H report comes out. So we would argue that they had enough information at that point in order to tell the market, the scope of this is pretty big. They actually come out two months later and say that, but at the time they make the contingency statement, what they say is, we don't think this is going to have a material effect. But of course, the contingency statement is after your clients purchased the securities, right? So it could have affected your client's purchase of the securities. That's right, your honor. Although what I will say is that this could be alleviated at the class certification stage. We could add an additional class rep if we need to. But the point of the argument that I was making earlier is that because this is a common course and scheme, our client does not need to have purchased before each false statement. The case that my adversary cites, which is Denny's, the reason that case was dismissed is because that plaintiff- Okay, I understand that. But I just want to make sure that your clients have a claim. So all of this information you were just talking about, how they had this increasing knowledge about the scope of the scheme, could you connect that to one of the statements on which you rely that occurred before your clients purchased the securities? Yes, your honor. We would argue that our client relied upon the compliance statements and the statement about the whistleblower and the financial statements. And that the full truth about those statements and the effect that it was going to have on the company wasn't known until the end of the class period. So the thing about taking appropriate actions with respect to the whistleblower statements, right? Yes. Is that a statement of opinion? Or you think that that's a statement of fact? When a company says we took appropriate actions? So I think the issue that we have with that statement is that if you look at what was happening at the time, you had the internal group legal saying, these are well-founded, we need to do something about it. You have the executive board refusing to take any more action or do any more investigation. And you have the- They took some action, right? They had shut down a number of the accounts and were not taking new accounts. That's true, your honor. But they continued to allow many of the accounts to launder money through the Estonian bank. And those NRP accounts that were still active continue to generate a tremendous amount of money. That's what I'm trying to get at about whether it's a statement of opinion. So if they had thought that those were the appropriate actions at the time, would that still be a misstatement? So if you look at Omnichair, I think that the issue with that statement, if you look at it as an opinion statement, is that they were omitting information at that point that would have provided factual context for an investor to actually put that whistleblower statement in place. But what's the omitted information? That actually there were actions we could have taken that we did not take. Is that the omitted information? Part of it was that they didn't fully investigate the whistleblower allegations. And I think that that statement gave cause to the market that a whistleblower reported something and they dealt with it. We would argue that subjectively and objectively, if you look at how they dealt with it, by trying to allow the money laundering to continue while they sold the Estonian branch versus just shutting down the NRP program right away, subjectively or objectively, we don't think that appropriate action was taken and we think a jury would agree. Of course, this is the pleading stage and we believe that we're entitled to an inference that the appropriate action wasn't taken. And in any event, Omnichair says that they would have had a duty to provide this information to the market. And just the last point I wanna make on both the Goodwill statement and on the compliance statements is, once you have a duty to speak, once you speak, you have a duty to disclose information so as not to mislead. So if you're making the compliance statement, we take necessary steps, they're taking the steps. Yes, we also have problems in Estonia, we're looking to remedy them. If you're looking at the Goodwill statement, just as you said before, instead of doing all of these linguistic gymnastics about whether technical does mean we're having a problem with AML, just tell the market, we're taking a Goodwill write down because we're having these issues in Estonia. And if you look at the B&H report, B&H report actually links the two. I believe it's page 60 of the B&H report. You have a discussion about what's happening at the Estonian branch, that they are winding down this profit center that makes 99% of the profits. And at the very end of that paragraph, you have the B&H report saying, and then they took this Goodwill write down. So just going back to the reason why the district court dismissed that statement, she found that we hadn't put a connection. I believe the B&H report, which is a report commissioned by defendants themselves, actually makes that connection for us. Thank you both. And we will take the matter under advisement. A nicely argued both sides. Thank you. Very helpful. Thank you, your honors. We have the other two cases are on submission for today. So that is the last case on the calendar. I'll ask the clerk to adjourn court. Court stands adjourned.